# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

TERRI L. HARTLINE,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　　) Case No. 16-cv-00509-JPG-CJP
　　　　　　　　　　　　　　　　　　　　)
NANCY A. BERRYHILL,　　　　　　　　)
Acting Commissioner of Social Security,　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.[1]　　　　　　　　)

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Terri L. Hartline (plaintiff), represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB on May 15, 2012, alleging disability beginning on August 1, 2009. (Tr. 11). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Patricia Witkowski Supergan denied the application on September 15, 2014. (Tr. 11-19). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by not giving the opinion of plaintiff's treating physician controlling weight.

2. The ALJ erred in finding plaintiff not credible.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

1

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*,

55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010)(*and cases cited therein*.)

### The Decision of the ALJ

ALJ Supergan followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date and that plaintiff had the following severe impairments: obesity, degenerative disk disease, degenerative joint disease, irritable bowel syndrome, and headaches. (Tr. 13). ALJ Supergan then found that plaintiff had the RFC to perform sedentary work, with the exception that she could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally balance, stoop, crouch, and crawl; tolerate occasional exposure to extreme cold and heat, wetness, humidity, vibration, fumes, and other pulmonary irritants; tolerate occasional exposure to hazards such as moving machinery or unprotected heights; perform unskilled work tasks that could be learned by demonstration or in thirty days or less if simple, repetitive, and routine nature; and that she would need to change positions every thirty minutes or hourly, for one to two minutes. (Tr. 14). Finally, the ALJ found that plaintiff could not perform past relevant work, but nonetheless was not disabled because jobs existed in significant numbers in

the national economy that plaintiff could perform. (Tr. 17-18).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.     Agency Forms.**

Plaintiff was born on September 26, 1975. (Tr. 181). She worked as an admitting clerk at a hospital from 1995 until 2003, and as a legal secretary from 2003 until 2009. (Tr. 186). Before this, plaintiff also held positions as a receptionist and a sales clerk. (Tr. 200). She claimed she was unable to work due to her inability to stand or sit for long periods of time, and occasional diarrhea that could last for multiple days. (Tr. 208). She was also unable to read for long periods. *Id.*

Plaintiff stated that she cared for her husband, daughter, stepdaughter, and two small dogs by doing what she could to assist with everyday living. (Tr. 209). Her husband cleaned, cooked, and did laundry when she was unable to. *Id.* She prepared family meals approximately once or twice per week. (Tr. 210). Plaintiff needed assistance with vacuuming, sweeping, and laundry, but could dust. *Id.* According to plaintiff, everyday chores were very difficult and took extra time to complete. (Tr. 215).

**2.     Evidentiary Hearing.**

Plaintiff was represented by counsel at the hearing on April 8, 2014. (Tr. 26). She testified that she was last employed as a legal secretary, and was laid off on either April 1 or April 11 of 2009. (Tr. 31, 43). Plaintiff attended college fulltime in 2011 for criminal justice, but did not complete her degree due to back pain, headaches, and stomach issues. (Tr. 32).

5

Plaintiff was one year and one semester shy of earning her degree. (Tr. 42).

Plaintiff alleged an onset date of April 1, 2009, because this is when her issues worsened. (Tr. 32). She had back pain and irritable bowel syndrome (IBS), which caused cramping. *Id.* Plaintiff did not file for DIB until May of 2012, when her primary care physician advised her to pursue benefits. (Tr. 43). Plaintiff began occasionally wearing protective undergarments in 2012 whenever she experienced diarrhea. *Id.* Plaintiff was five foot and four inches tall, and 204 pounds at the time of the hearing. (Tr. 33).

Plaintiff had been married for fourteen years and had one biological child and three stepchildren. (Tr. 34). Plaintiff attended two of her child's sporting games the year of the hearing. (Tr. 35). She was unable to attend the others because she could not sit for the whole time. (Tr. 45-46). Plaintiff occasionally cooked, but had to perform some tasks sitting down. *Id.* Her husband did most of the grocery shopping. *Id.* Plaintiff had a driver's license at the time of the hearing. (Tr. 36). She rarely used the computer. (Tr. 39). Plaintiff often helped her twelve-year-old daughter with homework. *Id.* However, severe headaches that affected her vision sometimes prevented her from helping. (Tr. 46). These headaches generally lasted two days and occurred twice to three times per month. *Id.* Plaintiff mainly socialized with friends and family over the phone and did not belong to any social groups. (Tr. 40). Plaintiff attended a parent-teacher conference that past February. *Id.* Plaintiff could not do laundry. (Tr. 42). Her only hobby was watching television. *Id.*

Dr. William Ribbing had been plaintiff's primary care physician for fourteen years. (Tr. 44). Plaintiff's medications made her nauseous, dizzy, and tired. *Id.* Consequentially, she took daily naps that lasted for, at least, an hour-and-a-half. *Id.* Plaintiff also used hot showers and ice to alleviate pain. (Tr. 45).

Plaintiff had difficulty bathing and sometimes did not bathe at all because of pain. *Id.* She experienced cramping and diarrhea at least one week per month. *Id.* Plaintiff had experienced lower back pain that traveled into her hips and legs for eight years. (Tr. 46). The pain had become increasingly worse with time and she rated it at an eight out of ten. (Tr. 47). Plaintiff's back problems made it difficult for her to work because she could only stand for fifteen to twenty minutes and sit for about ten to fifteen minutes. *Id.* Additionally, plaintiff could not squat or lift more than five pounds. (Tr. 47, 48). Dr. Ribbing imposed those lifting restrictions on plaintiff on multiple occasions. (Tr. 48-49).

Plaintiff missed many workdays during her last period of employment due to headaches, IBS, and back pain. (Tr. 47-48). The pain impaired plaintiff's concentration and memory. (Tr. 48). Plaintiff did not believe she could work a job that required her to sit for six hours out of an eight-hour workday. *Id.* Plaintiff experienced IBS flare-ups approximately five days per month, during which she would have twelve or more bowel movements per day. (Tr. 49).

Dr. Sherrill Nimagadda, a medical expert, testified next. (Tr. 50). She opined that plaintiff did not have an impairment that met a listing. (Tr. 51). Dr. Nimagadda further opined that plaintiff's RFC was that of the ALJ's ultimate finding. *Id.* Dr. Nimagadda did not examine or observe plaintiff in any way. *Id.*

Mr. Bose, a vocational expert (VE), then testified that a hypothetical person with plaintiff's characteristics and restrictions could not perform her past relevant work, but there were other sedentary, unskilled positions that plaintiff could perform. (Tr. 52-57).

**3.   Medical Records.**

Plaintiff received injection therapy from Pain Management Center of Paducah from 2008 to 2013. (Tr. 348-83, 599-607, 621-23). Throughout treatment, plaintiff complained of back,

leg, and neck pain, as well as headaches. *Id.* She was prescribed MS Contin, Doxepin, Xanax, Phenergan, Zanaflex, Fioricet, Medrol, Glucosamine, and Neurontin at various points throughout treatment. *Id.*

Plaintiff presented to Union County Hospital on January 8, 2009, with lower back pain, which she rated at a ten out of ten. (Tr. 463). A CT scan of her abdomen revealed bilateral spondylolysis at L5 without spondylolisthesis. (Tr. 467). On February 15, 2009, plaintiff received an x-ray of her lumbar spine, which identified bilateral spondylolysis at L5 with grade one spondylolisthesis of L5 on S1. (Tr. 458).

Plaintiff presented to Union County Hospital on April 3, 2009, with a headache that she rated at a ten out of ten. (Tr. 453). On December 28, 2009, plaintiff, again presented to Union County Hospital with pain in her forehead, which she rated at an eight out of ten. (Tr. 443). A CT scan of her brain revealed no remarkable findings. (Tr. 448). She received Dilaudid and Phenergan. (Tr. 444).

On May 2, 2010, plaintiff was admitted to Union County Hospital upon complaints of abdominal pain, nausea, vomiting, and diarrhea. (Tr. 405). She was diagnosed with gastroenteritis and received Dilaudid, Zofran, Rocephin, an oral replacement of potassium, and sent home with Phenergan. (Tr. 407). On August 2, 2010, plaintiff presented to Dr. James Edwards, who suspected lateral patellar dislocation in her left knee. (Tr. 329). Dr. Edwards recommended an MRI. (Tr. 330). On August 5, 2010, Dr. Edwards diagnosed plaintiff with left knee lateral patellar compression syndrome, chondromalacia of the patella, and a stress fracture of the proximal aspect of the fibula. (Tr. 332). He recommended crutches. *Id.* On August 23, 2010, Dr. Edwards and plaintiff planned a left knee arthroscopy with arthroscopic lateral release repair of the MPFL. (Tr. 333). On September 1, 2010, plaintiff underwent a left knee

8

arthroscopy, arthroscopic lateral release, chondroplasty of the patella, major debridement tricompartmental and MPFL plication.

On January 25, 2011, Dr. Tibrewala noted that plaintiff had experienced abdominal pain, diarrhea, and constipation since 2010. (Tr. 284). Dr. Tibrewala recommended a colonoscopy, advised plaintiff to take OsmoPrep, and also prescribed her Dexilant and Bentyl. (Tr. 285-86).

On February 25, 2011, plaintiff reported abdominal pain and diarrhea. (Tr. 278). She underwent a colonoscopy, which revealed GERD, internal hemorrhoids, a GE junction, polyp-sessile, and possible IBS. (Tr. 291-92). She also tested positive for c-dif. (Tr. 289). Her final diagnosis was duodenal mucosa with congestion, mild chronic active gastritis, mild acute ileitis with lymphoid hyperplasia, rectal mucosa with hemorrhage, and hyperplastic polyps. (Tr. 291). On March 23, 2011, plaintiff presented to Herrin Hospital with rectal bleeding and abdominal pain, which she rated at a six out of ten. (Tr. 253). She received a CT scan of her abdomen pelvis that revealed no evidence of bowel obstruction, fluid collections, or acute inflammatory changes. (Tr. 251). On March 29, 2011, plaintiff complained of bad headaches and abnormal cramping. (Tr. 302). She was diagnosed with DUB[2] and USI.[3] (Tr. 303).

On April 7, 2011, plaintiff presented to Union County Hospital with complaints of a headache. (Tr. 478). She was given Zofran and SC Sumatriptan. (tr. 481). On May 11, 2011, plaintiff presented to Union County Hospital with a headache, which she rated at an eight out of ten. (Tr. 487). A CT scan of her brain revealed no acute intracranial process. (Tr. 490). She was given Dilaudid and Phenergan. (Tr. 487). On May 26, 2011, plaintiff presented to Dr. Liu with abdominal pain, vomiting, and diarrhea. (Tr. 531). Dr. Liu noted mild tenderness in the epigastric area in the left upper quadrant. *Id.* On June 7, 2011, plaintiff complained of

---

[2] "DUB" is defined in Dorland's Medical Dictionary as dysfunctional uterine bleeding.
[3] "USI" is not defined in Dorland's Medical Dictionary.

abdominal cramping. (Tr. 529). On June 20, 2011, plaintiff received a pelvic ultrasound, which returned no significant findings. (Tr. 476). On June 21, 2011, plaintiff underwent an endometrial biopsy. (Tr. 306). On August 4, 2011, plaintiff saw Dr. Beyer-Nolen for a gynecologic consultation for not having menses since January, leaking of urine, urinary incontinence at times, abdominal cramping, and bleeding with urination. (Tr. 310). Plaintiff was prescribed Diflucan. (Tr. 312).

On December 1, 2011, plaintiff received an MRI of the left knee after presenting with complaints of lateral knee pain. (TR. 493). The MRI found patellar chondrosis, edema adjacent to lateral patellar retinaculum, small joint effusion, and minimal thinning of the anterior cruciate ligament. (Tr. 494). On December 15, 2011, Dr. Edwards opined that plaintiff had a lateral meniscus tear, and recommended knee arthroscopy with possible partial lateral meniscectomy. (Tr. 338). On December 23, 2011, plaintiff underwent a left knee arthroscopy with debridement. (Tr. 340). There was no evidence of any lateral meniscal tear. *Id.*

On April 9, 2012, plaintiff presented to Cape Girardeau Urology Associates with hematuria. (Tr. 496). She reported abdominal pain, constipation, occasional diarrhea, and a history of hematuria and vaginal bleeding. *Id.* A urine NMP22, cystoscopy, CT of her abdomen and pelvis, and renal ultrasound were ordered. (Tr. 499). Plaintiff presented to Union County Hospital with flank pain on April 28, 2012. (Tr. 393). A CT scan revealed no significant findings. (Tr. 401). She was given Toradol, Zofran, and Dilaudid. (Tr. 397). On May 14, 2012, plaintiff underwent a cystourethroscopy, which found no abnormalities. (Tr. 504). On August 10, 2012, plaintiff received a complete abdomen sonogram for complaints of abdomen pain, nausea, and vomiting. (Tr. 391). On September 24, 2012, plaintiff underwent an optometric examination at Marion Eye Centers and Optical. (Tr. 616). A history of Pseudotumor Cerebri

was noted, as well as pseudophakia ou, posterior capsular opacifications os, and astigmatism ou. (Tr. 617). On November 12, 2013, plaintiff received a CT scan of her abdomen and pelvis, which revealed no acute intra-abdominal or pelvic abnormality. (Tr. 651). A possible cyst or hemangioma was noted in her upper posterior right hepatic lobe. (Tr. 652). On March 26, 2014, plaintiff underwent a fluoroscopically guided lumbar puncture for her pseudotumor cerebral eye. (Tr. 640).

### 4. Dr. Ribbing's Treatment.

Plaintiff presented to Dr. Ribbing with a headache on June 3, 2010, and received Nubain and Phenergan. (Tr. 539). Plaintiff presented with knee pain on July 29, 2010, and was referred to physical therapy. (Tr. 538). Dr. Ribbing reported some effusion in plaintiff's left knee joint and knee tenderness. *Id.* On October 10, 2010, plaintiff presented with a left thoracic back sprain, for which Dr. Ribbing prescribed a Lidoderm patch. (Tr. 537). Dr. Ribbing noted tenderness in plaintiff's back. *Id.* Plaintiff reported heavy menstrual bleeding, a migraine, nausea, dizziness, and photosensitivity on November 10, 2010. (Tr. 536). Dr. Ribbing noted mild suprapubic tenderness and gave plaintiff Nubain, and hydrozyline for nausea. *Id.* He also gave plaintiff Provera for menorrhagia. *Id.* Plaintiff complained of intermittent abdominal cramping and diarrhea that had occurred for several months on December 8, 2010. (Tr. 535). Dr. Ribbing noted epigastric and midabdominal tenderness. *Id.* He placed plaintiff on Dexilant for epigastric discomfort, Lomotil for diarrhea and cramping, and noted she had Phenergan at home for nausea. *Id.* Plaintiff presented with severe headaches and nausea on December 10, 2010. (Tr. 534). Dr. Ribbing referred her to Union County Hospital Emergency Room for further evaluation and treatment option. *Id.* Plaintiff also reported depression and severe situational anxiety to Dr. Ribbing in March 2010. (Tr. 540, 552). Dr. Ribbing started plaintiff

11

on Cymbalta. *Id.*

On August 26, 2011, Dr. Ribbing switched plaintiff to Benazepril for hypertension. (Tr. 523). On November 28, 2011, plaintiff presented to Dr. Ribbing with a left knee injury and difficulty ambulating. (Tr. 521). He noted left knee tenderness and decreased range of motion secondary to pain, with some joint effusion. *Id.* He placed her in a knee brace and prescribed Percocet. *Id.* He also scheduled an MRI of plaintiff's left knee. *Id.*

Plaintiff presented to Dr. Ribbing on February 4, 2012, with complaints of a migraine, nausea, and vomiting. (Tr. 520). Dr. Ribbing gave plaintiff Nubian and Phenergan. *Id.* On February 7, 2012, plaintiff presented with a migraine that had lasted for four to five days. (Tr. 519). She stated that her pain injections made her drowsy and that her current headache medications were not helping. *Id.* Dr. Ribbing placed plaintiff on a trial of Tramadol. *Id.* On February 28, 2012, Dr. Ribbing refilled plaintiff's prescriptions for colestipol, Lomotil, and Bentyl. (Tr. 518). On April 10, 2012, plaintiff complained of lower abdominal pain. (Tr. 517). Dr. Ribbing noted suprapubic and lower abdominal tenderness, and a urinalysis showed a large amount of blood. *Id.* Dr. Ribbing referred plaintiff to an urologist for evaluation and sent plaintiff's urine for culture and sensitivity. *Id.* He advised plaintiff to continue her Bentyl. *Id.*

Plaintiff presented on August 1, 2012, with abdominal cramping, epigastric discomfort, right upper quadrant discomfort, generalized malaise and fatigue, occasional emesis, and nausea. (Tr. 571). Dr. Ribbing gave plaintiff a trial of Nexium and scheduled a CT scan of her abdomen. *Id.* He also advised her to continue Bentyl, Lomotil, and Colestipol for her IBS, and Neurontin, MS Contin, doxepin, Xanax, and Robaxin for her chronic pain. *Id.* Dr. Ribbing advised plaintiff to continue VESIcare for her spastic bladder. *Id.* On August 20, 2012, plaintiff complained of a migraine, for which Dr. Ribbing gave her Nubian and Phenergan. (Tr. 570). He recommended

IV medication if the symptoms did not resolve within twelve hours. *Id.* On November 20, 2012, plaintiff presented to Dr. Ribbing, who noted nonspecific generalized tenderness. (Tr. 614). He advised plaintiff to continue Bentyl, Lomotil, and cestipol for her IBS, and continue pain management, epidural injections, MS Contin Neurontin, dozepin, Xanac, Robaxin, and Fioricet for her chronic back pain. *Id.*

On January 1, 2013, Dr. Ribbing noted that plaintiff had symptoms consistent with fibromyalgia and depression. (Tr. 613). He placed her on a trial of Cymbalta. *Id.* Plaintiff presented on February 10, 2012 for a follow-up of hypertension, migraine, pseudotumor cerebri, IBS, back pain, tobacco use, and obesity. (Tr. 624). Dr. Ribbing increased plaintiff's losartan for hypertension, continued her Lomotil, Bentyl, and colestipol for IBS, and continued plaintiff's Fioricet, doxepin, Xanax, MS Contin, and Neurontin for migraines and back pain. *Id.* On November 12, 2013, plaintiff reported some nausea and vomiting associated with pain. (Tr. 626). Dr. Ribbing noted that her symptoms were consistent with choledocholithiasis or ascending cholangitis, and referred plaintiff to Memorial Hospital for immediate evaluation. *Id.* On September 6, 2013, plaintiff was diagnosed with a UTI and placed on Cipro and Pyridium. (Tr. 628). On August 23, 2013, Dr. Ribbing continued plaintiff's losartan for hypertension, advised plaintiff to continue her pain management and medications, and continued plaintiff's Lomotil, Bentyl, and colestipol for her IBS. (Tr. 629).

5. **Dr. Ribbing's RFC Assessment.**

On April 4, 2014, Dr. Ribbing completed a "Medical statement regarding physical abilities and limitations for Social Security disability claim." (Tr. 643). He opined that plaintiff could stand for less than fifteen minutes at a time, sit for less than fifteen minutes at a time, and occasionally lift five pounds. *Id.* Dr. Ribbing also opined that plaintiff could not bend, stoop,

balance, or work around dangerous conditions. *Id.*

> Dr. Ribbing stated,
>
>> Patient has been following with neurologist and pain . . . physician. She receives multiple injections and pain medications (high doses) to try to control pain and dysfunction. She is in constant pain that severely limits her ability to perform her ADLS. Due to these debilitating illnesses, she is incapable of working or being employed by anyone.

(Tr. 644).

### 6. State Agency Consultant RFC Assessments.

Dr. B. Rock Oh performed an RFC assessment in October 2012 and opined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and push and/or pull and unlimited amount. (Tr. 66).

Dr. Lenore Gonzalez also assessed plaintiff's RFC in March 2013. (Tr. 70-81). She opined plaintiff could frequently lift ten pounds, stand and/or walk for two hours, sit for about six hours in an eight-hour workday, and push and/or pull an unlimited amount. (Tr. 78). She further opined that plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, and could frequently balance, stoop, kneel, crouch, and crawl. *Id.* Also according to Dr. Gonzalez, plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, noise, vibration, and fumes, odors, dusts, gases, poor ventilation. (Tr. 79).

### 7. Other RFC Assessments.

Dr. Adrian Feinerman evaluated plaintiff in September 2012 and noted no limitations. (Tr. 576-86). Dr. James Peterson conducted a mental status examination of plaintiff, also in September 2012, and opined that plaintiff had a mood disorder. (Tr. 589-592).

Plaintiff's previous employer submitted a letter on March 31, 2014, stating that plaintiff was absent from work on numerous occasions due to headaches and back problems. (Tr. 642). He also stated, "It appears to me that she does have a case for being unable to maintain a job because of all of her illnesses." *Id.*

**<u>Analysis</u>**

Plaintiff first argues that the ALJ erred in not giving controlling weight to the opinions of plaintiff's primary care physician, Dr. Ribbing.

Pursuant to 20 C.F.R. § 404.1527(c), the Social Security Commission generally gives more weight to a medical opinion from the plaintiff's treating source, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record." Medical opinions, as defined in 20 C.F.R. § 404.1527, "reflect judgments about the nature and severity of [plaintiff's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [plaintiff] can still do despite impairment(s), and [plaintiff's] physical or mental restrictions."

If the ALJ determines that the treating physician's opinions are not entitled to controlling weight, she must offer "good reasons" for her determination and then evaluate the opinion in consideration of the factors set forth in 20 C.F.R. § 404.1527(d). *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

Here, the ALJ gave plaintiff's treating doctor no weight because "the opinion is based upon the claimant's subjective complaints, the function limitations appear to be a sympathetic opinion, and the opinion is not supported by the doctor's own objective clinical or laboratory findings." (Tr. 17). The ALJ also noted that a finding of disability is a decision reserved to the Social Security Administration. *Id.*

Dr. Ribbing did conclude in his April 2014 report that plaintiff was unable to work, (Tr. 644), which, under 20 C.F.R. § 404.1527(d), is not a medical opinion entitled to deference. Therefore, the ALJ did not err in rejecting Dr. Ribbing's ultimate disability finding. However, the report contains other opinions regarding plaintiff's symptoms, diagnosis, and physical limitations, which the ALJ cannot summarily dismiss.

The ALJ gave three reasons for discounting Dr. Ribbing's opinions: (1) they were sympathetic to plaintiff; (2) they were unsupported; and (3) they were based on plaintiff's subjective complaints. (Tr. 17). Because the ALJ failed to even minimally articulate why Dr. Ribbing's opinions appeared sympathetic or were unsupported, the ALJ's opinion cannot be upheld on these grounds. "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal quotations omitted).

The ALJ also disregarded Dr. Ribbing's assessment because it was based on plaintiff's subjective complaints. (Tr. 17). The Seventh Circuit has held that the ALJ may discount a treating physician's opinion when it is largely based on the plaintiff's subjective complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Dr. Ribbing regularly treated plaintiff for several years prior to completing the assessment. He occasionally utilized objective tests such as urinalysis (Tr. 517, 626), a sonogram (Tr. 574), and an x-ray (Tr. 625), which returned insignificant findings. Although he did note objective findings such as abdominal tenderness (Tr. 517, 535), suprapubic tenderness (Tr. 517, 536), tenderness in plaintiff's back and knee (Tr. 537, 538, 521), decreased range of motion in plaintiff's knee (Tr. 521), and joint effusion (*Id.*), Dr. Ribbing's assessment was based almost entirely on plaintiff's subjective complaints. Therefore, the ALJ did not err in refusing to

give Dr. Ribbing's opinions controlling weight.

However, the ALJ did err in failing to consider, at all, the other factors set forth in 20 C.F.R. § 404.1527(c). "Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion." *Campbell*, 627 F.3d at 308.

Plaintiff next argues that the ALJ improperly found plaintiff's subjective complaints not credible. "An ALJ is in the best position to determine the credibility of witnesses, and we review that determination deferentially." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). A credibility determination will only be disturbed if it is "patently wrong." *Id.* However, the finding must still be "supported by the evidence" and "specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.*

The ALJ, here, found plaintiff's complaints were not credible because she indicated that she could care for her personal hygiene, her family, and her pets, and could attend school meetings, sporting events, and classes. *Id.* The ALJ also found it suspect that plaintiff watched television, did chores, and helped her daughter with homework. *Id.*

A review of the record shows the ALJ grossly mischaracterized this evidence. Plaintiff stated, in regards to caring for her family, "I do what I can do for just everyday living." (Tr. 209). She alleged she prepared family meals once or twice a week and dusted. (Tr. 210). Plaintiff claimed she needed help with other household chores such as vacuuming, sweeping, and laundry, and ultimately found house and yard work "very difficult." (Tr. 211). Plaintiff also testified that she sometimes did not bathe because it was too painful. (Tr. 45). In regards to attending sporting events, plaintiff testified she had only attended two that year because she was unable to sit for the entirety of the event. (Tr. 45-46). She also testified that she dropped out of

school because of her symptoms (Tr. 32) and was unable to help her child with homework sometimes due to headaches (Tr. 46). Plaintiff did testify that she attended a single parent-teacher conference that year. (Tr. 40).

Moreover, the Seventh Circuit has "remarked the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment." *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). The Seventh Circuit stated:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Thus, the ALJ cannot rely on plaintiff's ability to complete household chores as the basis for discrediting plaintiff's subjective complaints, let alone a mischaracterized summary of her daily activities. Although the ALJ also opined that plaintiff's "subjective complaints are not consistent with the medical evidence of record," the ALJ offered no more explanation. Because the credibility determination was unsupported and insufficiently articulated, it is patently wrong.

In sum, the ALJ improperly equated plaintiff's ability to perform household chores with an ability to maintain employment, and failed to offer any other support for the adverse credibility determination. The ALJ also erred in failing to assign any weight to the opinion of plaintiff's treating doctor, Dr. Ribbing, or articulate her reasons for not doing so.

## Conclusion

The Commissioner's final decision denying application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and

18

reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:** 6/6/2017

<i>s/J. Phil Gilbert</i><br>
<b>J. PHIL GILBERT<br>
U.S. DISTRICT JUDGE</b>